Steven A. FRIEDMAN, M.D.

v.

DELAWARE COUNTY MEMORIAL HOSPITAL, et al.

STEVEN A. FRIEDMAN, M.D., P.C.

v.

DELAWARE COUNTY MEMORIAL HOSPITAL, et al.

Civ. A. Nos. 83–0398, 83–3278.

United States District Court,
E.D. Pennsylvania.

Oct. 19, 1987.

Robert B. Surrick, Surrick and Gollatz, Media, Pa., for plaintiff; David Weinstein, Philadelphia, Pa., of counsel.

Joseph A. Torregrossa, Paul H. Zoubek, Morgan, Lewis & Bockius, Albert J. Schell, Jr., Philadelphia, Pa., for Victor Galati, M.D., Donald Powers, M.D. and Medical Associates of Drexel Hill, Inc.

Hal Doig, John J. Maffei, Media, Pa., H. Robert Halper, Mary S. Philip, John J. Miles, O'Connor & Hannon, Washington, D.C., for Delaware County Memorial Hosp., Richard D. Thomas.

## MEMORANDUM

GILES, District Judge.

## INTRODUCTION

This antitrust action arises out of the decision of the Board of Trustees of Delaware County Memorial Hospital ("DCMH") on January 26, 1983 to revoke the staff privileges of Steven Friedman, M.D. for misconduct. Plaintiffs, Dr. Friedman and his professional corporation Steven A. Friedman, M.D., P.C., allege that DCMH and its President and Chief Executive Officer, Richard D. Thomas, conspired with certain physician defendants practicing as Medical Associates of Drexel Hill, Inc. ("MADH" or "Drexel Hill defendants"), Dr. Victor G. Galati and Dr. Donald V. Powers, to terminate Dr. Friedman's staff privileges in violation of federal antitrust laws. Plaintiffs have also asserted pendent state claims for breach of contract and tortious interference with prospective advantage.

The Drexel Hill defendants and the DCMH defendants have filed separate motions for summary judgment as to all counts of plaintiffs' amended complaint.

Plaintiffs have made a cross-motion for partial summary judgment on five issues: (1) that defendants' conspiracy, if proved at trial to the satisfaction of the jury, is a *per se* group boycott; (2) that defendants have not established and cannot establish their entitlement to the narrow 'rule of reason' exception to *per se* treatment of their group boycott; (3) that even when judged by the 'rule of reason,' the defendants' conduct is unlawful as a matter of law because Dr. Friedman was denied the fair notice and opportunity for a meaningful hearing which are essential to fundamental due process; (4) that defendants had waived any alleged deficiencies in Dr. Friedman's procedures by their knowing disregard of those matters when his privileges were renewed as of August 20, 1981, and (5) that the Hospital has materially breached its contract with Dr. Friedman.

An original complaint, No. 83-0398, was filed on January 26, 1983, the same day that the DCMH Board revoked plaintiff's staff privileges. On January 27, 1983, Dr. Friedman filed an amended complaint. On July 9, 1983, the second complaint, No. 83-3278, was filed by plaintiff's professional corporation, of which he is president and sole shareholder. The causes of action alleged in the two suits are identical. On September 30, 1983, they were consolidated.

Dr. Friedman was a staff physician in the pulmonary disease section of the DCMH Department of Medicine from 1973 until January 26, 1983, when the DCMH Board voted unanimously to revoke his staff privileges following a lengthy internal review of his practice and performance at the hospital.

DCMH is a nonprofit hospital located in Drexel Hill, Pennsylvania, within the Philadelphia metropolitan area. Since 1977, Mr. Thomas has been the hospital's president and chief executive officer. Dr. Galati is Chief of the Pulmonary Disease Section at DCMH. Dr. Powers is a specialist in renal disease, and is chief of the DCMH Renology, Hypertension and Fluid Balance Section. He is not a pulmonary specialist, but is claimed to benefit from the alleged antitrust violations, being a member of the partnership with Dr. Galati. Both sections represented are part of the DCMH Department of Medicine.

In his answers to interrogatories, the plaintiff alleges that William A. Hadfield, Jr., M.D., William Beckwith, M.D., Harold Haft, M.D., and Hal F. Doig, Esquire, are co-conspirators. (DCMH Ex. 1, Plaintiff's Answer and Draft Supplemental Answer to Inter. No. 48). The DCMH Board was dismissed as a defendant on April 4, 1983.

Dr. Hadfield is the Director of the DCMH Department of Medicine and initiated the charges against Dr. Friedman. These are the charges upon which the DCMH Board concluded that revocation of his staff privileges was appropriate. Dr. Beckwith is chief of the DCMH Cardiology Section. Dr. Haft is chief of the DCMH Neurosurgery Section and was president of the DCMH medical staff while a portion of the proceedings which led to the revocation of the plaintiff's privileges were in progress. Mr. Doig is a member of the law firm which provided legal advice and services to DCMH in connection with the proceedings against Dr. Friedman and continues to represent DCMH in this lawsuit.

In Count I of the amended complaint, Dr. Friedman alleges that the defendants violated Section 1 et seq. of the Sherman Act, 15 U.S.C. § 1 et seq. He claims that, beginning in 1982, they conspired "to exclude plaintiff from practicing medicine" at DCMH, with the purpose "to destroy and obtain for themselves a large portion of plaintiff's practice." (A. Comp., ¶ 23). More specifically, it is claimed that defendants conspired to instigate and procure the filing of misconduct charges against him;

to cause the DCMH Medical Staff's Medical Executive Committee to vote to revoke his staff privileges; to influence the writing of the decision of a medical staff ad hoc committee which heard the charges in a trial-like setting; to recommend to the DCMH Board that his privileges be revoked; and to prevent him from being afforded due process. (A. Comp., ¶¶ 24, 40). According to the plaintiff, the purpose of the alleged conspiracy was "to increase [the defendants'] patient load and to maximize billings for defendant hospital." (A. Comp., ¶ 41).

In Count II, the plaintiff alleges that, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, the defendants "conspired ... in an attempt to monopolize the provision of pulmonary care" (A. Comp., ¶ 46) and that his exclusion from DCMH "has resulted in ... monopolization, or attempted monopolization, of pulmonary medical services at defendant hospital." (A. Comp., ¶ 47).

In Count III, the plaintiffs allege various causes of action based on Pennsylvania law, including unreasonable restraint of trade, tortious interference with contractual relations, tortious interference with prospective advantage and breach of contract.

For these reasons and those which follow, defendants' motions for summary judgment must be granted and plaintiff's motion for partial summary judgment must be denied.

PROCEDURAL BACKGROUND

This court heard plaintiff's motion for a preliminary injunction in January, 1983. On January 31, following two days of hearings, the motion was denied. As of that time, the court concluded that Dr. Friedman had failed to show sufficient competent evidence from which a jury could find that there was an unlawful conspiracy under [Section 1] of the Sherman Act. Specifically, there was:

insufficient evidence showing the existence of an agreement between Drs. Powers, Galati and/or Prestel and the board of directors and/or its agents, which resulted in the increase of the sanction by the board of directors for violations of

the hospital rules and regulations which were found by the ad hoc medical committee and, as found or supported by the medical executive committee, both of which recommended probation in some form. Transcript of Preliminary Injunction Hearing, Jan. 31, 1983, at 218.

The court has allowed extensive discovery in the case. The record thus far consists of the depositions of numerous persons. They include the defendants, Mr. Thomas and Drs. Galati and Powers; the alleged nondefendant co-conspirators: Drs. Hadfield and Haft; the five ad hoc committee members: Selma Balaban, M.D., John E. Bevilacqua, M.D., Claude Williams, M.D., Robert G. Trout, M.D., and Henry A. Scheuermann, D.M.D.; eight DCMH Board members: E. Stanley Bowers, Alonzo H. Davis, J. William Erb, Lillian H. Griffin, Rev. George S. Hewitt, William L. Maruchi, John H. Nagel, chairman of the board, and Henry A. VanZanten; Dr. Friedman and his wife; Edwin D. Arsht, M.D.; and Betsy Murren, secretary to the medical staff. It also includes the transcripts of proceedings conducted as part of the internal review process and voluminous documents pertaining to the gravamen of the misconduct charges against Dr. Friedman, the alleged overuse of therapeutic bronchoscopies, absence of documentation of the indications for such use and utilization of the procedure in disregard of the list of criteria indications adopted by DCMH.

The treatment of pulmonary disease is a subspeciality of internal medicine. The pulmonary disease specialist diagnoses and treats the major disease areas of the subspeciality such as chronic obstructive pulmonary disease, asthma and emphysema and also must have skills in radiology; interprets smears for bacteria, fungi and non-malignant cells; engages in pulmonary function testing, respiratory care, respiratory physical therapy and rehabilitation; interprets pulmonary scintigraphy; performs biopsies, endotracheal and pleural intubation, and bronchoscopies.

Bronchoscopy is a procedure sometimes used in the diagnosis and treatment of pulmonary disorders. It is an invasive procedure which requires the insertion of a rigid or flexible fiberoptic tube (bronchoscope), either through the nose or the mouth into the patient's lungs. Bronchoscopy is a relatively common procedure, but it is not free of risk of complications and can be unpleasant for the patient.

Diagnostic bronchoscopies are helpful in providing direct gross examination of suspicious lesions, establishing the location and extent of a pathologic process, and providing a precise diagnosis by examination of biopsied tissue or of collective secretions.

At DCMH, therapeutic bronchoscopies, on the other hand, are to be used only in the treatment of patients with copious secretions and "[c]ontinued abnormal gas exchange, abnormal pulmonary function by spirometry, X–ray findings of atelestasis, or copius secretions on auscultation of chest, *unresponsive* to a previously adequate trial of conservative respiratory therapy." (DCMH Ex. 8, Med. Dept. Rules & Regs. at App. 4) (emphasis in original). In general, the purpose for therapeutic bronchoscopies is to remove excess secretions of mucous from the lungs to improve the patient's ability to breathe, but only after non-invasive therapies have failed to alleviate the problem.

### FACTUAL BACKGROUND

A. *DCMH Background, Organization and Procedures for Terminating Staff Privileges*

DCMH is a nonprofit community hospital that provides short-term, general acute hospital care to residents of Delaware County and adjacent counties in southeastern Pennsylvania. Approximately thirty-five hospitals are within ten miles of DCMH. Dr. Friedman is on the staff of Fitzgerald–Mercy Hospital, which is only 2½ miles from DCMH. (Thomas Aff., ¶ 3). DCMH has approximately 250 active medical staff members and over 1,200 full-time and part-time employees. (*Id.* at ¶ 4).

The DCMH medical staff is organized into nine departments: the departments of

medicine, emergency services, family practice, surgery, obstetrics and gynecology, anesthesia, pediatrics, pathology, and radiology. Each department has a director who is in charge of the department, reports to the administration and Board, and is an administrative official of the hospital. The hospital departments are divided into sections by medical specialty or subspecialty. (*Id.* at ¶ 5; DCMH Ex. 2, DCMH Med. Staff Directory, 1982–83, at 1–5).

DCMH is accredited by the Joint Commission on Accreditation of Hospitals (JCAH), a private accreditation agency for hospitals. (Thomas Aff., at ¶ 4). JCAH conducts surveys of hospitals to measure and encourage their compliance with the JCAH standards, and, in recognition of substantial compliance, awards accreditation. (DCMH Ex. 3, Joint Comm. on Accreditation of Hosps., *Accreditation Manual for Hospitals*, ix (1983) (JCAH Manual)). To maintain its JCAH accreditation, the hospital must be operated in accordance with the principles and standards established by that group. DCMH also must meet the regulatory standards of the Pennsylvania Department of Health and comply with its rules and regulations, as well as with its own corporate bylaws.

### 1. *The DCMH Governing Body*

The governing body of DCMH is its Board of Trustees. It has overall responsibility for insuring that the hospital functions in a manner consistent with an objective of high quality care to the community. The DCMH Board has 27 members, each of whom (except the hospital's president) serves without compensation for an elected term of three years.

DCMH Board members serve on standing and special board committees established by the corporate bylaws to facilitate operation of the hospital. Two of the Board's committees were involved in the events leading to the termination of Dr. Friedman's staff privileges: the Board Executive Committee, which transacts all regular business of the hospital during the interim between full Board meetings; and the Joint Conference Committee, comprised

of the members of the Board's standing medical committee and a like number from the medical staff, which works to effect better patient care and comunications between the Board and the medical staff. The Joint Conference Committee also reviews medical staff recommendations relating to a staff member's privileges whenever the Board does not agree with the medical staff's recommendation. However, the final decision is with the Board of Trustees.

### 2. *THE DCMH Administration*

#### a. *The Chief Executive Officer*

The Board has delegated responsibility for the daily operations of DCMH to Mr. Thomas, who has been president and chief executive officer since 1977. He is in charge of the overall administration of the hospital. His duties include implementing all policies established by the Board, working with the medical staff to ensure that the best care will be given to all patients, assuring the hospital's compliance with the law, attendance at all meetings of the Board and its committees, and insuring that all departments are staffed adequately to provide professional services to DCMH patients. He performs all other duties necessary for the efficient operation of the hospital.

#### b. *The DCMH Medical Departments*

The DCMH medical department director and section chiefs also are part of the hospital's administration. The largest of the departments at DCMH is its Department of Medicine which has adopted rules and regulations relating to proper standards of medical care. The director of the Department of Medicine, William A. Hadfield, Jr., M.D., was appointed to that position by the DCMH Board in July, 1979 upon the recommendation of the medical staff's Medical Executive Committee (MEC).

As director of the Department of Medicine, Dr. Hadfield is accountable to the DCMH Board for all professional and administrative activities within his department. He reviews the professional performance of medical staff members in his department and is generally responsible for

enforcement of the corporate bylaws, the medical staff bylaws, the medical staff rules and regulations, and the Department of Medicine rules and regulations. In addition, he must transmit recommendations to the MEC concerning reappointment and delineation of the clinical privileges for all members of his department. The departmental chairpersons are required by JCAH regulations to monitor the performance of physicians in their department, to recommend whether members should be reappointed, assure that quality of care is evaluated and report to the MEC. Dr. Hadfield is an internist and does not practice pulmonary medicine.

The Pulmonary Disease Section is a section of the Department of Medicine. Dr. Galati, the chief of the Pulmonary Disease Section is board certified in pulmonary medicine. As Chief of the Pulmonary Disease Section, Dr. Galati is responsible for his section and reports to Dr. Hadfield, alerting him to all problems and activities within the section. Additionally, Dr. Galati is responsible for the Pulmonary Function Laboratory and for overseeing respiratory therapy and respiratory therapists.

### 3. *The DCMH Medical Staff*

The medical staff is a third part of the hospital's organization. Its members are appointed by the DCMH Board for one-year periods. While the medical staff is responsible for making recommendations to the Board, the Board makes the final decision regarding "medical staff appointments and reappointments, as well as the granting, curtailment, suspension or revocation of clinical privileges."

The DCMH medical staff has administrative responsibility for the quality of medical care provided to DCMH patients and for the ethical conduct and professional practices of its members. However, it is accountable to the Board. Pursuant to the direction and approval of the Board, the medical staff has adopted bylaws and rules and regulations regarding its relationship with the hospital. *See*, 28 Pa.Admin. Code §§ 103.3(7), 103.4(8), 107.11.

The president of the medical staff is elected by its members and serves as chief administrative officer. He must coordinate and cooperate with the president of DCMH in all matters of mutual concern within the hospital. When charges were brought against Dr. Friedman, Dr. Haft, a neurosurgeon and alleged co-conspirator, was president of the medical staff. As a neurosurgeon, Dr. Haft did not compete with Dr. Friedman. (Haft Aff., ¶ 14).

The DCMH medical staff has administrative committees, several of which were involved in events leading to charges being brought against Dr. Friedman and the subsequent proceedings. The Medical Executive Committee (MEC) is comprised of the directors of the medical departments at DCMH and other medical staff representatives. The MEC represents the entire medical staff and acts on its behalf. 28 Pa.Admin. Code § 107.25. It reviews all matters relating to clinical privileges and is specifically responsible for the initiation of and/or participation in medical staff corrective or review measures when warranted. The Pennsylvania Department of Health Rules and Regulations require the MEC to "take reasonable steps to ensure ethical professional conduct on the part of all members of the medical staff, and initiate such prescribed disciplinary measures as are indicated." 28 Pa.Admin. Code § 107.-25(b)(5).

Other medical staff committees that addressed problems with Dr. Friedman included the Quality Assurance, Admissions and Utilization Review, Medical Records, Endoscopy, Operating Room, and Grievance Committees. The Quality Assurance Committee (which is sometimes referred to in hospital documents as the "Quality Care" or "Audit" Committee) is responsible for "reviewing the professional activities as they pertain to the quality care of patients" according to a plan that satisfies applicable regulations. (Med. Staff Bylaws, Art. XII, § 1.G.(2).) This committee's major function is to audit medical procedures performed at the hospital and determine if they were justified and performed competently. The Endoscopy Committee, a special committee formed in late 1978 com-

prised of members of the DCMH Gastro-enterology and Pulmonary Disease Sections (including Dr. Friedman), formulated guidelines (sometimes referred to as "criteria" or "indications") in January 1980 for therapeutic bronchoscopies to be used by the quality assurance committee in its review of bronchoscopies. (Hadfield Aff., ¶ 10).

The Admissions and Utilization Review Committee conducts studies designed to evaluate "the appropriateness of admissions to the hospital, lengths of stay, discharge practices, use of medical and hospital service and all related factors which may contribute to the effective utilization of hospital and physician services." It also analyzes how overutilization of hospital or medical services affects the quality of patient care. (DCMH Ex. 6, Med. Staff Bylaws, Art. XII, § 1.F.(2)). The Medical Records Committee makes recommendations regarding the institution of practices to improve the hospital's medical records function. (*Id.*, Art. XII, § 1.J.(2).) The Grievance Committee investigates and evaluates incidents and unprofessional behavior by staff members referred to it by the MEC.

### 4. *Administrative Procedures for Revocation of Staff Privileges*

The DCMH Medical Staff Bylaws provide the framework by which corrective action, including the termination of privileges, can be taken against a staff physician. Article VII, Section 2 provides that the director of any clinical department, the president of the medical staff, the chairman of any medical staff standing committee or the president of the hospital may request corrective action "[w]henever the activities or professional conduct of any staff member are considered to be lower than the standards of the Hospital or to be in violation of the Bylaws, Policies, Directives, Orders, Rules and Regulations of the Board of Trustees and Medical Staff in force at the time, or to be disruptive to the operations of the Hospital."

The process commences with a letter of charges, including a request for corrective action, to the MEC. The letter is sup-

ported by reference to improper conduct by the physician in question who is notified of the charges. The charges are then considered by the MEC which, after an appearance by the physician in question, may "reject or modify the request, ... impose terms of probation, ... or recommend that the individual staff membership be revoked." (Med. Staff Bylaws, Art. VII, § 2.C.)

If the MEC recommendation is adverse to the physician, he may invoke the "Hearing and Appellate Review Procedure" found in Article VIII of the DCMH Medical Staff Bylaws. The first step is a hearing before an ad hoc committee of the medical staff, whose duty is to formulate a recommendation. The MEC then reviews that recommendation and sends its final recommendation to the Board. (Med. Staff Bylaws, Art. VII). They physician may appeal that recommendation. If, as in Dr. Friedman's case, he does not appeal, the matter is ripe for the Board's decision. If the Board disagrees with the MEC recommendation, the matter is reviewed by the Board's Joint Conference Committee, which formulates a recommendation to the Board. The matter then goes back to the Board for its final decision. (*See* Med. Staff Bylaws, Art. VIII).

### B. *The Charge Against Dr. Friedman*

On March 23, 1982, pursuant to the Medical Staff Bylaws, Dr. Hadfield wrote Harold Haft, M.D., the medical staff president and chairman of the Medical Executive Committee, and initiated charges against Dr. Friedman. He cited seven different grounds for the charges:

(1) overutilization of bronchoscopies—Dr. Friedman violated the DCMH bronchoscopy criteria, failed to order indicated laboratory studies, and failed to document objectively any change in the pulmonary status of his patients following therapeutic bronchoscopy;

(2) inappropriate intravenous hyperalimentation—Dr. Friedman had inappropriately ordered salt poor albumin, intralipids, and hyperalimentation as nutrition-

al supplements for his patients' weight gain;

(3) delinquent medical records—Dr. Friedman's medical records had not been sufficiently detailed or organized to provide evidence of effective continuing patient care, and his admitting privileges had been suspended 19 times in the past two years for delinquent record keeping;

(4) staff attendance requirements—Dr. Friedman had not satisfied the minimum attendance requirements for departmental meetings;

(5) evasion of Utilization Review Committee recommendations—Dr. Friedman had repeatedly circumvented the Utilization Review Committee's recommendations that his patients be placed in a more appropriate level of care;

(6) failure to cooperate with hospital personnel and misuse of hospital facilities—Dr. Friedman had failed to work with hospital personnel in planning the discharge of his patients, and had repeatedly cancelled or rescheduled the use of the Endoscopy Room; and

(7) attitude toward the patients and the public—Dr. Friedman sometimes had been indifferent to the feelings of his patients and to the public image of the hospital.

Dr. Friedman was provided with the letter of charges, the DCMH Medical Staff Bylaws, the corporate bylaws, the DCMH Rules and Regulations, the medical department rules and regulations, and materials which were used to substantiate the charges against him. He also was permitted to copy patient charts which would be used to support the charges. (Thomas Aff., ¶ 20).

As provided in Article VII, Section 2B of the DCMH Medical Staff Bylaws, Dr. Hadfield's charges were referred to the MEC, which met with Dr. Friedman first on April 26 to review the matter.

Dr. Hadfield, after reviewing the charges, recommended to the MEC that it recommend to the Board of Trustees that Dr. Friedman's privileges be revoked. Dr. Friedman responded to the charges, and in particular, the bronchoscopy issues. After considering all of the evidence presented from all sides, the MEC voted 8 to 7 to recommend to the DCMH Board that it revoke Dr. Friedman's privileges.

Dr. Friedman asked Dr. Haft in his capacity as president of the staff to appoint an ad hoc committee to review, after a full hearing, the charges against him. This was done. The chosen members of the committee were not pulmonary specialists. At the hearing, which continued from August 25 through 30, 1982, Dr. Friedman was represented by counsel of his choice. The proceedings were stenographically recorded. Every aspect of every charge was explored or, at least, there was full opportunity to do so. Drs. Galati and Powers were summoned to testify by the committee and were subjected to cross-examination. Dr. Galati testified about the adoption of the list of indications for bronchoscopy use for quality patient care. Dr. Powers testified about Dr. Friedman's extensive use of the DCMH Intensive Care Unit for pulmonary patients and his performance of multiple bronchoscopies.

Dr. Thomas testified about patient complaints about Dr. Friedman, the effect his poor record-keeping had on hospital administration and of his nineteen suspensions of privilege during a two-year period because of delinquent medical records.

Dr. Hadfield described the history of DCMH with Dr. Friedman, including a prior disciplinary probation related to excessive use of bronchoscopies, a blind outside audit from which it was concluded that Dr. Friedman's use of bronchoscopies were not supported by the list of adopted criteria or indications, and of Dr. Friedman's asserted intentions to continue his use of therapeutic bronchoscopy without feeling bound by the adopted criteria.

Dr. Friedman testified and called witnesses, some of whom supported his medical views as to the appropriateness of the extent of his use of therapeutic bronchoscopy and the inappropriateness of the DCMH indications.

The ad hoc committee had before it the full array of medical opinion on all subjects

touching upon the charges of misconduct. After the hearing the ad hoc committee deliberated almost two months. There is no evidence that any defendant had any improper contact with this committee during its deliberations. It issued a written report and recommendation to the MEC on October 28, 1982. It found that the charges against Dr. Friedman had been substantiated and that his bronchoscopy use and methodology were unacceptable. Specifically it said:

The Committee finds that allegations of misconduct of Dr. Friedman have been substantiated, and that his behavior has resulted in controversy and disharmony in the hospital community. These charges vary in their severity and some have been mitigated by evidence that Dr. Friedman has made a credible effort to correct acknowledged deficiencies.

The Committee finds the charges dealing with the overutilization of bronchoscopies are most serious. It has been clearly demonstrated that the number of bronchoscopies performed at Delaware County Memorial Hospital significantly exceed, on a comparable basis, those done at other institutions in the area. The majority of these bronchoscopies have been done by Dr. Friedman, who has failed to justify the therapeutic benefit of these procedures. He has failed to follow conscientiously the criteria for therapeutic bronchoscopies formulated by the Endoscopy Committee of which he himself is a member. He has not altered his bronchoscopy practice, although he has been repeatedly admonished to do so. Furthermore, he has testified that it is his intention to continue this practice in the manner he deems appropriate.

The Committee finds that violations of hospital regulations and the stated intent by Dr. Friedman to continue practice outside the scope of these regulations adversely affect the level of medical care given at Delaware County Memorial Hospital.

(Ad Hoc Comm. Rept.).

The committee recommended that Dr. Friedman be placed on a strict probation for one year, commencing January 1, 1983, and that: (1) all his bronchoscopies have prior written approval by the chief of service, Dr. Galati, or his designee; (2) a written review of his performance be included in each of the minutes or reports to the MEC from the following committees of the medical staff: Utilization Review, Medical Records, Operating Room, Endoscopy, Intensive Care Unit, and Audit (*i.e.*, quality assurance); and (3) the MEC review his staff privileges prior to the staff-reappointment process and at the expiration of his probation. The committee concluded that if, at the probation's end, there was evidence that Dr. Friedman still was not following established hospital procedures or not abiding by the bylaws, rules, and regulations, then the MEC should consider recommending termination of his staff privileges.

Dr. Hadfield disagreed with the ad hoc committee's recommendation of probation since allegations of misconduct had been found to have been substantiated and the earlier probation had not deterred the present conduct.

Between the issuance of the ad hoc committee report on October 28 and the Medical Executive Committee meeting on November 3, when the MEC met to discuss the ad hoc committee report and to formulate a recommendation to the DCMH Board, Dr. Hadfield expressed his views about the ad hoc committee's recommendation to a number of his section chiefs in the DCMH department of medicine. Dr. Beckwith, chief of the Cardiology Section, asked Dr. Hadfield if a letter expressing support for Dr. Hadfield's position would be proper. Dr. Hadfield responded that such a letter, if signed by section chiefs in his department, would inform the MEC that probation was impractical. Dr. Beckwith then drafted a letter to Dr. Hadfield which was signed by Drs. James J. Thornton, William R. Beckwith, Frank C. Passero, Donald v. Powers, Victor Galati, George C. Wong, Frederick J. Dwapian, Joan C. Waller, Edwin W. Bixby, and Peter V. Parry, each of whom was a section chief in the Department of Medicine.

Dr. Galati also felt that the ad hoc committee's recommendation regarding his responsibilities for supervising Dr. Friedman's practice were impractical and probably unethical. Therefore, on November 2, 1982, he wrote Dr. Hadfield explaining that

the [ad hoc committee] recommendations imply a continuous *prospective* review of individual cases daily by another physician. This is not only time consuming, but impractical. The legal repercussions to the reviewing physician and the hospital are also quite concerning. The payment for "Second Opinion" consultations seems unfair to the patient, who ultimately will be responsible for such fees charges, not to mention the questions that will certainly be raised by the insurance companies for duplicating consultations. The final responsibility for the care of these individual patients and the culpability for any complications incurred during such treatment, will have to be discussed with the lawyers, but it would seem that it would rest in the hands of the reviewing physician and/or the hospital ultimately.

He concluded that, "[b]ecause of the above legal and ethical problems which may occur by implementing the Ad Hoc Committee's recommendations, I must refuse to take part in any ongoing monitoring suggested."

The ad hoc committee's report was referred to the MEC for a final recommendation to the Board. It was discussed at the November 3 MEC meeting along with the position letter from the section chiefs of the Department of Medicine presented by Dr. Hadfield.

The MEC voted to recommend to the DCMH Board that Dr. Friedman be placed on a one-year probation. It eliminated the ad hoc committee's recommendation of prior written approval of Dr. Friedman's bronchoscopies by Dr. Galati, but did recommend monitoring of Dr. Friedman's activities by the six standing medical staff committees named in the ad hoc committee report: Utilization, Medical Records, Operating Room, Endoscopy, Intensive Care Unit and Audit. It also recommended that

Dr. Friedman's staff privileges be reviewed prior to reappointment and at the expiration of the probation period; if there were evidence that Dr. Friedman was not following established hospital procedures or not abiding by the bylaws, then the MEC would recommend the termination of his privileges. The MEC did not disturb the findings of the ad hoc committee that allegations of misconduct had been substantiated. (DCMH Ex. 126, MEC Min., Nov. 3, 1982). Dr. Friedman was notified of the MEC's recommendation and his of right to appeal it to the Board. He chose not to appeal the MEC's findings or recommendation.

## C. Review by the DCMH Board and Its Joint Conference Committee

On November 22, 1982, the Executive Committee of the DCMH Board met and considered the MEC recommendation. The Executive Committee directed that legal counsel prepare a summary of the almost 2,000 pages of documents and testimony presented before the ad hoc committee to facilitate review by Board members. This summary was prepared by Hal F. Doig, DCMH counsel. There is no evidence that either Dr. Galati or Dr. Powers played any part in its preparation.

The DCMH Board held a special meeting on December 7, 1982, to discuss procedural matters relating to the MEC's recommendation regarding Dr. Friedman. John J. Maffei, DCMH counsel, explained the relevant bylaw procedures and the proceedings that had occurred. Materials relating to Dr. Friedman were distributed to DCMH Board members. These included the May 28, 1982 letter from Mr. Thomas to Dr. Friedman outlining the charges, the report of the ad hoc committee, and the summary prepared by Mr. Doig of the testimony and documents presented to the ad hoc committee. Board members were also told that they could review the entire transcript of the ad hoc committee proceedings. Some DCMH Board members did read all or almost all of the ad hoc committee record and felt that Dr. Friedman's privileges should be terminated. (Affs. of Hewitt, ¶ 7; Long, ¶ 7; C. Schlosser, ¶ 7; A. Schlos-

182

ser, ¶ 7; Toole, ¶ 7; DCMH Ex. 133, Hewitt Dep., at 32–33, 103; DCMH Ex. 134, Maruchi Dep., at 41, 124–25). Dr. Friedman's personnel file which was maintained by the hospital was also made available. Some Board members reviewed the personnel file; others did not.

At Dr. Friedman's request, he and his wife met with several members of the DCMH Board, Mr. Thomas and Dr. Hadfield on December 20. Dr. Friedman presented his position and distributed materials, including letters from his medical experts, which he believed supported his position. Prior to that meeting, Dr. Friedman had met with Dr. Galati who stated that he would cooperate in Dr. Friedman's probation as recommended by the MEC on November 3, 1982.

Dr. Hadfield, however, believed that Dr. Friedman's privileges should be revoked and wrote Mr. Nagel, Chairman of the Board, advising that he was unwilling to participate in monitoring Dr. Friedman. He expressed concern that any such action would result in the department members being exposed to legal liability should Dr. Friedman commit bronchoscopy malpractice.

On December 21, the DCMH Board held its next regularly scheduled meeting. Mr. Nagel reported on the December 20 meeting with Dr. and Ms. Friedman and distributed the materials that Dr. Friedman had given him. After discussion, the Board adopted unanimously the following resolution:

Resolved that the Medical Executive Committee findings that the allegations of misconduct against Dr. Friedman have been substantiated be accepted but that the recommendation of the Medical Executive Committee that Dr. Friedman be placed on probation be denied and that Dr. Friedman's Medical Staff Membership and Clinical Privileges be revoked.

Mr. Thomas and Dr. Haft, who served on the Board because of their positions at the hospital abstained from participation or voting because of their previous involvement in the matter. (DCMH Ex. 137, Bd. Min., 12/21/82, at 4). As required by the medical staff bylaws, Dr. Friedman was notified of the Board's decision.

Because the Board arrived at a final decision contrary to the MEC's recommendation, the matter was referred to the Board's Joint Conference Committee which was comprised of six members of the medical staff and six members of the Board. Mr. Thomas advised the committee members of the Board's resolution and scheduled a meeting for January 12, 1983. Dr. Friedman was informed that he could appear before the Joint Conference Committee meeting but chose not to do so. His attorney, Mr. Surrick, submitted a letter stating that the Board's action violated the medical staff bylaws and that he and Dr. Friedman would not attend the meeting because "we do not intend to give credence to these proceedings by appearing." Mr. Surrick also indicated that Dr. Friedman had filed suit against the Board in the Delaware County Court of Common Pleas challenging the Board's actions in voting to revoke his staff privileges.

Dr. Friedman alleged in this state court case that the Board's action violated the medical staff bylaws, arguing that the Board could not impose a sanction more severe than that recommended by the MEC.

On January 12, 1983, the Joint Conference Committee voted ten to two that the Board adopt and implement its December 21 resolution. Dr. Friedman was informed of the recommendation and that he could appear at the next Board meeting.

On January 26, 1983, the Board met and considered the recommendation of the joint conference committee. Both Dr. Friedman and his attorney, Robert Surrick, attended this meeting. Mr. Surrick made a presentation. After Dr. Friedman and his attorney left, there was considerable discussion. A motion was made and unanimously approved that the recommendation of the Joint Conference Committee be accepted. Again, Dr. Haft and Mr. Thomas abstained from the vote and expressed no views on the Friedman matter.

The record shows that various factors influenced the individual decisions of the Board members. None of them involved a decision to benefit Dr. Galati or Dr. Powers. Rather, there was concern about exposure to medical malpractice claims should Dr. Friedman continue to disregard the therapeutic use criteria adopted by the hospital. This was especially acute in light of Dr. Friedman's stated unwillingness to change his practice.

The preliminary injunction request was denied by the Delaware County Court. It ruled that the Board was the final decision-maker in medical staff membership matters. Dr. Friedman's appeal of that ruling to the Superior Court was denied *per curiam* with a finding that he had received a due process hearing at DCMH.

### D. *Events Leading to the Charges*

Dr. Friedman had a history at DCMH of unorthodox use of the bronchoscope on critically ill respiratory patients which had caused great concern among members of the staff that his conduct overstepped the bounds of professional conduct. The problems included his bronchoscope on a dead patient, use of the bronchoscope to perform a gastroscopy, an invasive examination of the stomach, contrary to instructions on use of a gastroscope, and the belief that he was performing excessive bronchoscopies. In June 1976, he was placed on a six month probationary period by action of the Board of Trustees which emphasized monitoring of the number of endoscopic procedures.

The Medical Staff Committee formed to monitor his procedures during this period noted that he performed at least one bronchoscopy on each of his patients and questioned whether all were indicated. This committee recommended establishing guidelines for use of bronchoscopies to the Medical Executive Committee.

After the lifting of his probation in February, 1977, problems continued with Dr. Friedman's performance. In June 1977, Dr. Galati was appointed to the DCMH Medical Staff in the Pulmonary Disease Section.

In early 1978, Dr. Fornwalt, then the president of the DCMH Medical Staff, requested that the committee which had reviewed Dr. Friedman's activities during his probation review Dr. Friedman's recent cases. On March 16, 1978, Dr. Resnick, chair of that committee, reported that Dr. Friedman had performed 158 bronchoscopies during the previous six months. He noted that practically all of Dr. Friedman's patients suffering from chronic obstructive pulmonary disease (COPD) had been bronchoscoped, but that the procedures' efficacy in benefitting patients was not documented. Dr. Resnick suggested that guidelines be established concerning the use of bronchoscopy in the treatment of COPD and that the pulmonary physicians involved should explain why the procedure did not shorten the patient's length of stay in the hospital.

Dr. Resnick, Dr. Friedman, Dr. Galati and Robert Banes, M.D., a physician in the DCMH Department of Family Practice who also treated patients with pulmonary diseases, met in April, 1978, to discuss possible overutilization of procedures for patients with COPD, as well as the length of stay of COPD patients at DCMH. They agreed to adopt recommendations relating to limitations and indications for bronchoscopy. These bronchoscopy guidelines were approved by the MEC on May 25, 1978, and by the DCMH Board at its June 28, 1978 meeting. They applied primarily to diagnostic bronchoscopies.

Later in 1978, an Endoscopy Committee of the medical staff was formed, which was comprised of members of the DCMH Gastroenterology and Pulmonary Disease Sections and included Drs. Friedman and Galati among others. That committee was responding, in part, to audit deficiencies raised by Blue Cross of Greater Philadelphia beginning in 1979, which were directed to the Medical Audit Committee. An April 24, 1980 report of audit by Blue Cross stated, in part,

> The audit of therapeutic bronchscopy, which involves only two physicians, shows what appears to be an unnecessarily high proportion of unjustified bronchoscopies or, at least, bronchoscopies

performed without adequate preliminary studies on the part of one physician. There is also no analysis of complication rates included in this audit.

The audit on bronchoscopy cannot be considered adequate until it is demonstrated that corrective action has been addressed to the findings of this audit. It appears that this is not a new problem but was disclosed on two previous audits. (DCMH Ex. No. 55).

Dr. Hadfield, who was appointed Director of the DCMH Department of Medicine in July, 1979, in late 1979, requested that committee to formulate a list of indications or criteria for therapeutic bronchoscopies to be used by the medical staff's Quality Assurance Committee in its auditing of bronchoscopies.

Dr. Hadfield asked Dr. Galati, who was chief of the Pulmonary Disease Section, to draft proposed criteria or "indications for therapeutic bronchoscopy." He did so. The draft was made available for all members' comments, including Dr. Friedman, who made suggestions.

On January 11, 1980 a final list of indications was approved by the Endoscopy Committee. The bronchoscopy criteria specified certain indications and limitations for the use of therapeutic bronchoscopies. The limitations stated that an adequate trial of conservative therapy should be employed and documented before a therapeutic bronchoscopy was performed. The criteria also indicated that post-bronchoscopy improvement of the patient should be documented by objective measurement, including improvement of blood gas exchange and pulmonary function testing.

The criteria or indications were subsequently approved as part of the DCMH Department of Medicine Rules and Regulations by the Quality Assurance Committee on February 14, 1980, by the MEC in August, 1980, as part of its approval of an internal bronchoscopy audit and by the DCMH Board on September 24, 1980.

On February 20, 1980, Dr. Hadfield sent a copy of the indications to Dr. Friedman and reminded him that bronchoscopies performed at DCMH had to conform to them.

(DCMH Ex. 52, Ltr. from Hadfield to Friedman). He also met with Dr. Friedman on February 23, 1980, and told him that his therapeutic bronchoscopies appeared to be excessive, that he had to follow the indications, and that bronchoscopies at DCMH were being audited.

In April, 1980, the Quality Assurance Committee completed an audit of bronchoscopies performed by Drs. Galati and Friedman. The committee concluded that Dr. Galati had performed no multiple procedures and that all of his bronchoscopies had appropriate indications; it found, however, that Dr. Friedman had performed repeat bronchoscopies. The report also noted that, with respect to Dr. Friedman's cases, there was a paucity of pulmonary function studies, inadequate chest x-rays, too few arterial blood gas tests, and that no apparent efficacy of therapeutic bronchoscopies was demonstrated.

Dr. Hadfield informed Dr. Friedman that the audit showed a lack of documentation in his bronchoscopy charts. Dr. Friedman responded that, while he had approved the bronchoscopy indications when they were developed by the Endoscopy Committee, he was no longer sure that he agreed with them. Dr. Hadfield suggested that Dr. Friedman submit written comments to the Quality Assurance Committee if he did not agree with the indications. He cautioned Dr. Friedman that, unless and until the indications were changed, he had to follow them and provide the required documentation. He also told Dr. Friedman that bronchoscopies would continue to be audited and that if his charts were still found deficient, he might not be allowed to bronchoscope patients without prior approval from Dr. Galati, the Pulmonary Disease Section chief.

The Quality Assurance Committee continued to audit bronchoscopies, and at its September 18, 1980 meeting, found that two of Dr. Friedman's bronchoscopies were not indicated. These cases were referred to Dr. Hadfield, Dr. Friedman's departmental director, for investigation. Dr. Hadfield asked Dr. Galati, as chief of the Pulmonary Disease Section, to review the bronchosco-

pies in question. On October 10, 1980, the Quality Assurance Committee referred five more Friedman bronchoscopies to Dr. Hadfield for further investigation because they were either questionable or did not appear indicated. The committee specifically requested that Dr. Galati review certain charts which their audit identified as problematic. In response, Dr. Galati reviewed seven of Dr. Friedman's bronchoscopy charts and on October 10, reported his conclusions. While several of the bronchoscopies appeared in compliance with the DCMH indications, most of the repeated procedures were questionable or were without adequate documentation to guage the therapeutic benefit to the patient.

In mid-December, 1980, Dr. Hadfield wrote to Dr. Friedman again regarding what he believed to be Dr. Friedman's continuing failure to comply with the DCMH bronchoscopy indications. (DCMH Ex. 67, Ltr. from Hadfield to Friedman).

On January 26, 1981, Drs. Friedman, Hadfield and Galati and Messrs. Thomas and Thomas J. McKittrick, then DCMH Assistant Administrator, met with Dr. Friedman to discuss his problems at DCMH. Dr. Hadfield warned that if his deficiencies respecting bronchoscopy indications were not corrected, he would recommend that his privileges be suspended. Dr. Friedman insisted that he was being unfairly singled out and stated that he intended to perform bronchoscopies whenever he thought they were indicated and that he did not necessarily agree with the bronchoscopy indications. He also said that an outside pulmonary specialist (whom he did not identify) had reviewed his charts and agreed with his handling of seven of nine cases.

A few days after the January 26 meeting, Dr. Friedman approached Harold Haft, M.D., president of the DCMH medical staff, to discuss the meeting. Dr. Friedman complained that he was being treated unfairly. Dr. Haft told Dr. Friedman that he must follow the DCMH bronchoscopy indications. Dr. Haft advised Dr. Friedman that if any medical literature or medical schools supported his approach to the use of bronchoscopy he should advance it

so that it could be evaluated by the medical staff. Dr. Friedman never did. He refused to state that he would abide by the hospital's indications for therapeutic bronchoscopy and suggested that any effort by the hospital to change his practice would be a "restraint of trade, something that affects my livelihood and more importantly, something that affects my ability to take care of these patients."

Because Dr. Friedman had claimed that a pulmonary expert concurred in his treatment and because there appeared to be different opinions regarding whether Dr. Friedman was following the bronchoscopy indications. Dr. Hadfield decided that the hospital should have an independent, outside audit performed of bronchoscopies at DCMH to determine whether the bronchoscopies performed there conformed to the hospital's indications. Mr. Thomas agreed with the suggestion and, in April or May, he contacted Richard Spence, M.D., a physician experienced in medical care auditing, about performing an audit of bronchoscopies.

The bronchoscopy audit was conducted by Dr. Spence and Eugene Lugano, M.D., a pulmonary specialist at the Hospital of the University of Pennsylvania. Prior to the audit, the DCMH Medical Records Department was instructed to pull 25 bronchoscopy patient charts for each physician performing bronchoscopies at DCMH. These charts were to be pulled consecutively, but were to be completed charts for patients already discharged from the hospital. Personnel in the DCMH Medical Records Department then pulled 25 charts for patients of Dr. Friedman and a combined total of 26 charts for Dr. Galati and Thomas F. Prestel, M.D., another pulmonary specialist who had joined the DCMH staff in 1981 and practiced with Dr. Galati. (DCMH Ex. 74, DCMH Answer to Inter. No. 71.). As specified, the charts were pulled consecutively, except where it was necessary to skip charts because they were not complete.

The charts were then reviewed by Dr. Spence and his assistant, who recorded information from the charts on a form. The abstracted bronchoscopy charts were then

reviewed by Dr. Lugano, who measured each of the abstracted charts against the DCMH bronchoscopy criteria. The audit was conducted in a "double-blind" manner; Dr. Lugano did not know the identity of the physicians whose charts he was reviewing or even the hospital involved. Drs. Galati, Hadfield and Powers had no input into how the audit was structured. Drs. Galati and Powers were not even aware that it was being performed.

The audit report concluded that of the 25 bronchoscopies performed by Dr. Friedman, 15 were either "not indicated" or "probably not indicated," while six were either "possibly indicated" or "probably indicated." Only four of Dr. Friedman's bronchoscopies were found to be "indicated." In addition, the audit reviewer commented that Dr. Friedman failed to obtain indicated laboratory studies and that there was little documentation by him of the efficacy of the procedure.

Dr. Galati, as chief of the Pulmonary Disease Section, reviewed the audit. He concluded that the audit had been performed in a "professional, scientific and non-prejudiced manner"; that the auditors' conclusions showed the lack of documented benefits from therapeutic bronchoscopy, particularly for COPD patients, and the under-use of conservative respiratory therapeutic procedures in certain cases; and that the audit supported the validity of DCMH's indications for bronchoscopies.

On October 7, 1981, Mr. Thomas sent the audit report and other material regarding Dr. Friedman to Hal F. Doig, the hospital's attorney, and asked for advice regarding "appropriate alternatives" in dealing with the Friedman problem. Subsequently, Mr. Doig advised Mr. Thomas and Dr. Hadfield that the evidence regarding Dr. Friedman appeared sufficient to bring charges before the MED. In his subsequent written response to Mr. Thomas' letter, Mr. Doig explained that Dr. Friedman had violated the hospital's indications for bronchoscopy and that continued violations without corrective action by DCMH would make it vulnerable to charges of medical malpractice.

In addition to the bronchoscopy problem, Dr. Friedman's conduct presented other difficulties warranting incident reports. Dr. Friedman failed to respond promptly to requests by nursing personnel that he come to the hospital and attend a patient who was experiencing serious difficulties. The patient died shortly after Dr. Friedman finally arrived. Dr. Hadfield requested Dr. Friedman explain the incident. When Dr. Friedman did not respond, Dr. Hadfield wrote him again, noting that his "reluctance to respond to reasonable requests is a source of increasing concern to me and reflects adversely on your responsibility, which is shared by all physicians to provide quality care at all times to our patients."

In April, 1981, an incident report was filed regarding Dr. Friedman's performance of a thoracentesis at 5:00 a.m. Dr. Hadfield asked Dr. Friedman to explain why he had performed this non-emergency procedure at such an early hour without nurse support and without obtaining the patient's written consent prior to the invasive procedure.

Another recurring problem was Dr. Friedman's failure to comply with hospital recordkeeping requirements. His admitting privileges at DCMH were suspended on numerous occasions because of his failure to complete charts and the adequacy of those he did complete was also a concern. In December, 1981, Dr. Galligan, chairman of the DCMH Medical Records Committee, informed Dr. Friedman that 64% of his charts did not meet specified JCAH criteria regarding the recording of significant findings, while 45% did not satisfy JCAH standards regarding documentation of treatment rendered. Dr. Galligan also notified Dr. Friedman that 15 charts from his file contained clinical resumes that were unacceptable according to JCAH standards. The Medical Records Committee recommended that Dr. Friedman redictate all of these clinical resumes.

Because of the continuing problems with Dr. Friedman, a member of Dr. Galati's section, Dr. Hadfield, asked Dr. Galati to prepare an evaluation of Dr. Friedman. In his March 4, 1982 response, Dr. Galati reit-

erated the results of his January literature review and his belief in the validity of DCMH's bronchoscopy indications. He also noted that the outside, independent bronchoscopy audit had found that, in approximately 60% of the cases reviewed, Dr. Friedman's bronchoscopies were determined to be "probably not indicated or not indicated." Dr. Galagi expressed no view, however, regarding Dr. Friedman's practices or whether any corrective action should be taken.

By early 1982, Dr. Hadfield had determined that corrective action to revoke Dr. Friedman's privileges was necessary because of the hospital's long-standing problems with him and his unwillingness to modify his practices. As Director of the DCMH Department of Medicine, the medical staff bylaws authorized Dr. Hadfield to initiate corrective action proceedings against a physician whose "activities or professional conduct ... are considered to be lower than the standards of the Hospital or to be in violation of the Bylaws, Policies, Directives, Orders, Rules and Regulations of the Board of Trustees and Medical Staff ... or to be disruptive to the operations of the hospital...." (Med. Staff Bylaws, Art. VII, § 2A.). Dr. Hadfield then requested that Mr. Thomas and the hospital administration assist in collecting materials relating to the charges. (Thomas Dep. June 28, 1983, at 45). Mr. Thomas and Dr. Hadfield, with the help of DCMH medical records personnel, compiled a notebook of background materials relating to the various charges. (*Id.*, July 19, 1983, at 251–52).

Prior to initiating the corrective action proceedings, Dr. Hadfield discussed the matter with each of his section chiefs in the Department of Medicine. None except Dr. Arsht, chief of the Allergy Section, expressed any objection to Dr. Hadfield about his bringing charges against Dr. Friedman. (*Id.* at 83). Although Dr. Arsht recognized that some of the charges might be true, he felt that the sanction was excessive. There is no evidence that Drs. Powers and Galati induced Dr. Hadfield to initiate the charges.

## DISCUSSION

### A. *Summary Judgment Standards*

Where a moving party has met its initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact, the plaintiff in an antitrust conspiracy case, to survive a motion for summary judgment, must establish that there is a genuine issue of material fact as to whether defendants entered into an illegal conspiracy that caused plaintiff to suffer a cognizable injury. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation,* 475 U.S. 574, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The issue of fact must be genuine, that is, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." *Id.,* Fed.R.Civ.P. 56(e).

In considering a motion for summary judgment, "the inferences must be drawn from the underlying facts and must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). However, the party who bears the burden of proof at trial on an issue must establish the existence of all essential elements of its case. *Celotex Corporation v. Catrett,* 477 U.S. 317, ——, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The moving party has no burden to negate the opponent's claim. *Id.* There is no genuine issue of fact unless there is sufficient evidence that a jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The Supreme Court has ruled that antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 Sherman Act case. "Conduct as consistent with permissible competition as with illegal competition does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Electric Industrial Co., Ltd., supra,* 106 S.Ct. at 1357, *citing Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Therefore, to survive a motion for

summary judgment on a § 1 claim, the plaintiff must present testimony "that tends to exclude the possibility" that the alleged conspirators acted independently. *Id.*

■ With respect to the § 2 claims, in meeting the defendants' motions for summary judgment, plaintiff has the burden of producing sufficient evidence to establish the basic elements that the alleged conspirators had a specific intent to monopolize the relevant product and geographic markets and had, or attempted to acquire, such market power that there is a dangerous probability of success. *Pontius v. Children's Hospital*, 552 F.Supp. 1352 (W.D. Pa.1982); *National Reporting Co. v. Alderson Reporting Service*, 763 F.2d 1020 (8th Cir.1985).

Plaintiff cannot show the requisite elements of his antitrust claims as a matter of fact or law. The DCMH Board of Trustees had legitimate business justifications for revoking Dr. Friedman's staff privileges and there is no evidence tending to show otherwise. There is no evidence that Dr. Galati or Dr. Powers, the alleged pulmonary specialist group competitors, had input into the board's decision or conspired with any voting member of the board.

With respect to the monopolization or attempted monopolization claims of 15 U.S.C. § 2, in addition to the foregoing reasons, plaintiffs cannot show that DCMH is an appropriate market for bronchoscopies, in general, and certainly not for the "school" of liberal use bronchoscopy that he wishes to practice.

### B. *The Section 1 Sherman Act Claims*

Section 1 of the Sherman Act reaches unreasonable restraints of trade effected by "contract combination or conspiracy between separate entities." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 828 (1984). The Court has established a tiered standard of review to determine whether a Section 1 violation has occurred. "Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that

each is illegal *per se* without inquiry into the harm ... actually caused." *Id.* A Section 1 violation based upon combination requires courts to engage in a balancing test using a rule of reason approach. The rule of reason requires the courts to look at the "combinations, such as mergers, joint ventures, and various vertical agreements [which] hold the promise of increasing a firm's efficiency and enabling it to compete more effectively [and] ... [to] assess the combination's actual effect." *Id.* *See also Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). A conspiracy claim requires the plaintiff to "establish a genuine issue of material fact as to whether [defendants] entered into an illegal conspiracy that caused [plaintiff] to suffer a cognizable injury." *Matsushita*, 475 U.S. 574, 106 S.Ct. 1348, 1355, 1356, 89 L.Ed.2d 538.

■ The Third Circuit established additional essential elements to establish for a Section 1 Sherman Act claim, namely the plaintiff is required to prove (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets; (3) that the objects of the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy. *Martin B. Glauser Dodge v. Chrysler Corp.*, 570 F.2d 72 (3d Cir.1977). For the reasons that follow, I find no contract, combination or conspiracy exists in the case at hand and so do not reach the other Third Circuit requirements.

### 1. *No Per Se Violation of Section 1 of the Sherman Act Exists*

Dr. Friedman, who is board certified in internal medicine, but not as a pulmonary specialist, objects to what he terms "conservative restrictions" placed by DCMH on his treatment of patients through the liberal use of therapeutic bronchoscopies. He contends now that DCMH shows a preference for the pulmonary specialist whose approach to the therapeutic use of bron-

choscopy is conservative. Therefore, he contends he has been discriminated against, as an adherent to the liberal "school" of medical practice, in violation of the antitrust laws. He submits that that preference constitutes a *per se* violation of Section 1 of the Sherman Act and that this court's decision on that issue is controlled by the Third Circuit's holding in *Weiss v. York Hospital*, 745 F.2d 786 (3d Cir.1984), *cert. den.*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (March 18, 1985) ("Weiss II"). In that case the court held that it was a *per se* violation of Section 1 of the Sherman Act for a hospital medical staff composed exclusively of allopatic (M.D.) physicians to exclude an alternative medical discipline practiced by osteopathic (D.O.) physicians. Plaintiff claims that defendants have asserted this preference for the financial benefit of Dr. Galati and MADH and that the preference has no rational basis.

The indications adopted by the hospital cannot be said to preclude the practice of therapeutic bronchoscopy. On February 20, 1980, Dr. Hadfield wrote Dr. Friedman a letter enclosing the indication list and advised him that it was mandatory that every physician performing the procedure follow them. The letter also stated that should any situation arise where the physician believed that a therapeutic bronchoscopy was required in a patient who does not fall within the indications listed, that the physician must obtain approval from the Chief of Pulmonary Diseases or his designated representatives in order to perform the procedure. There is no evidence that Dr. Friedman ever sought approval for a therapeutic bronchoscopy procedure that was not indicated or that approval, if sought, was denied, and, if denied, that the denial was unreasonable.

While Dr. Friedman contends that his is a "liberal approach" to bronchoscopy, he does not define that phrase except to suggest that he or his school is at liberty to do a therapeutic bronchoscopy without regard to indications or established studies. Nor can Dr. Friedman establish that the indications adopted are contrary to sound medical practice or even that a "conservative approach" to therapeutic bronchoscopy is inconsistent with quality patient care or unreasonable as a professional standard of a medical provider, the hospital.

The Chairman of the Committee on Bronchoscopy of the American College of Chest Physicians, Dr. Roger C. Bone, M.D., FCP, FCCP, Professor of Medicine and Chief of the Pulmonary Division of the University of Kansas for Medical Sciences, reviewed the DCMH criteria for therapeutic bronchoscopy and the documentation requirements and opined that they were excellent in all respects except in one area, which he regarded as more liberal than he felt appropriate. In sum, he concluded that the DCMH requirements were valid and necessary. (DCMH Ex. No. 110).

Dr. Friedman cannot offer any evidence that he was precluded from offering any justification for any procedures he performed. Nor can he offer any evidence that the documentation requirements for therapeutic bronchoscopies were not sound medical practice, a breach of which would raise serious questions as to medical competency and potentially subject the physician and hospital to claims of malpractice. The actions by the DCMH and the various committees were not intended nor did they have the anti-competitive effect necessary to allege a § 1 Sherman Act violation. Clearly, the DCMH adherence to a policy of requiring physicians to follow the indications, except where a deviation could be justified and approved, is a matter which falls squarely into the "public service" function of the hospital.

To establish a *per se* violation plaintiff needs to show that the hospital acted in such a manner that the effect of the action was to solely control plaintiff's access to the marketplace. *International Salt Co. v. U.S.*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). Plaintiff has not established that the purpose of defendants' action was to deny him, and his manner of practice, access to the hospitals within the Delaware Valley. Defendants have proffered other reasons why they chose to dismiss Dr. Friedman. Namely, that DCMH restricts staff privileges to physicians who agree to

promote quality patient care. In so restricting staff privileges DCMH was acting to protect the hospital to which they owe a duty of care from potentially significant liability. Thus, plaintiff cannot show that the sole reason DCMH acted was to deny him access to the marketplace, and he is precluded from successfully claiming a *per se* violation.

### 2. *No Rule of Reason Violation*

■ In addition, the Third Circuit has recognized that the *per se* approach is not appropriate where there are contentions that the physician is incompetent or has engaged in unprofessional conduct. *Weiss II*, 745 F.2d at 860. In such instances, a "rule of reason balancing approach" must be utilized. *Id.* Here, there were misconduct charges against Dr. Friedman which were found to have been substantiated after a hearing from which there was no appeal by plaintiff. The hospital standards did not preclude the use of bronchoscopy as a therapeutic technique. Rather, they precluded that use as a primary treatment modality or when not indicated by the adopted criteria; when non-invasive, conservative techniques had not been tried; or when the bronchoscopy could not be documented as efficacious. The record shows beyond question that the hospital standards did not preclude a school of medicine but were designed to promote quality medical care, which necessarily included reducing life threatening risks to patients. The hospital did not choose between schools of medical thought but rather it chose the boundaries within which it would permit its staff to expose it to medical malpractice claims. Dr. Friedman ultimately took the position that he would not follow the DCMH indicators on therapeutic bronchoscopy and would continue his use as in the past. In effect, he chose not to practice at DCMH.

■ Under a "rule of reason" analysis it is obvious that Dr. Friedman's anti-trust claims must be dismissed because his desired approach to performance of therapeutic bronchoscopy without adherence to rea-

sonable, flexible medical precautions and indications would reduce the hospital's competitive position. The Third Circuit recognized that a doctor who has trouble getting along with other people will reduce efficiency and exclusion of such doctors is pro-competitive and permissible under a rule of reason. *Weiss II, supra.* Certainly, a physician who refuses to follow medical procedures established to protect patients from unnecessary surgical procedures is disruptive of hospital efficiency.

Moreover, Dr. Friedman's claim that the hospital's actions were unlawful as a matter of law because Dr. Friedman was denied due process is without merit. The manner in which the DCMH acted in response to a flagarant and continuous violation of the procedures was reasonable. The hospital provided Friedman with an opportunity to explain his operating procedure, advised against such procedure and provided him an option to conform to what the DCMH believed were more suitable practices in the bronchoscopy field. For a more complete discussion of the due process afforded Dr. Friedman, *see* Section C, *infra.*

### 3. *No Conspiracy Among Defendants*

■ There is no evidence that either Dr. Galati or Dr. Powers took any action respecting Dr. Friedman except as specifically requested by the committees or other heads of the medical staff responsible for peer review and quality patient care. At all times when they acted, they did so as agents of the hospital. Since a hospital cannot conspire with itself, there can be no conspiracy as a matter of law.[1] In order for an illegal Sherman Act conspiracy to exist, there must be two independent economic entities, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628.

Drs. Galati and Powers, as members of a medical partnership, have an economic interest in the treatment of pulmonary disorders at DCMH. There is no evidence, however, that they sought to compete with Dr.

---

1. *See Tunis Bros. Co., Inc. v. Ford Motor Co.,* 763 F.2d 1482, 1496 n. 21 (3d Cir.1985).

Friedman in his methodology of bronchoscopy. Further, there is no evidence that either reacted to Dr. Friedman's situation except in a peer review capacity, and, hence, no evidence that either acted out of personal economic interest as opposed to the interests of the hospital. Dr. Galati's conduct is "consistent with other equally plausible explanations[;] [therefore] the conduct does not give rise to an inference of conspiracy." *Matsushita*, 106 S.Ct. at 1361.

Under Pennsylvania's "Peer Review Protection Act," any person who provides information to a peer review committee that is related to the performance and duties of the committee and is not false or believed to be false shall not be held criminally or civilly liable. 63 P.S. § 425.3(a). Therefore, as a matter of law, the actions of Drs. Galati and Powers in reviewing Dr. Friedman's performance as a staff physician at the request of the Chairman of the Department of Medicine or medical staff committees responsible for audits and quality of patient care cannot be the factual basis of an anti-competitive claim. This is especially so where the views expressed are expressed in a due process hearing, subjected to cross-examination and counter-evidence and ultimately judged by a committee of unbiased physicians. *See Marrese v. Integral, Inc.*, CCH 1984–1 Trade Cas. ¶ 66,271 (7th Cir., Nov. 6, 1984)[2]; *Pontius v. Children's Hospital*, 552 F.Supp. 1352, 1376 (W.D.Pa.1982).

Dr. Galati had a very limited role in the decisions of others to discipline Dr. Friedman. Prior to the initiation of charges, Dr. Galati conducted a literature search at the request of Dr. Hadfield concerning the use of fiberoptic bronchoscopy. He evaluated Dr. Friedman, again at Dr. Hadfield's request. Later, Dr. Galati met twice with Drs. Hadfield and Haft, again at Dr. Hadfield's request, to discuss the Friedman proceedings prior to the May 5, MEC meeting. Dr. Galati attended the first part of this meeting, but only after he had been requested to do so by Dr. Haft and Dr.

Hadfield because other MEC members wanted a pulmonologist to attend. He was one of 26 witnesses who testified before the ad hoc committee. Dr. Powers also testified at the ad hoc committee, concerning Dr. Friedman's extensive use of the Intensive Care Unit and his own experience with Dr. Friedman.

Finally, Dr. Galati took three other steps. He wrote a letter to Dr. Hadfield on November 2, stating that he would not participate in the continual monitoring of Dr. Friedman's bronchoscopies, as originally recommended by the ad hoc committee, because he perceived legal and ethical problems. In addition, he signed a letter, also dated November 2, prepared by Dr. Beckwith and signed by all the other section chiefs in the Department of Medicine, which noted their concern about the substantiated charges of misconduct and the difficulty of complying with the conditions of probation suggested by the ad hoc committee. This letter expressed the view that Dr. Friedman's privileges should be terminated. Finally, Dr. Galati chaired a subcommittee requested to formulate guidelines for the proper use of bronchoscopies. Dr. Friedman also participated in this effort. The criteria developed did not preclude therapeutic bronchoscopies, but rather placed the burden on the doctor to justify undertaking the procedure.

This was the extent of Dr. Galati's participation. He did not attend the November 3, 1982 MEC meeting at which the committee upheld the ad hoc committee's findings and voted to recommend that Dr. Friedman be placed on probation. Nor did he contact any of the members of the Board or attend any Board meetings concerning Dr. Friedman.

Had the Board followed the recommendation of probation by the MEC in November, 1982, there would have been no substantial effect upon Dr. Friedman's privileges or on competition. The record demonstrates no evidence that the Board's decision to terminate Dr. Friedman's privileges entirely arose from any conspiracy with Dr. Galati

---

**2.** In Marrese, the court held that conduct clearly articulated and affirmatively expressed as state policy and actively supervised by the state is immune from antitrust liability.

or Dr. Powers. On the contrary, the record indicates that the Board's action arose from its independent consideration of the ad hoc committee and MEC findings that Dr. Friedman had failed to follow hospital rules, that he had over-used bronchoscopies and that such conduct was likely to continue because Dr. Friedman would not agree to follow the bronchoscopy criteria developed by the hospital.

Dr. Friedman cannot show that these criteria and precautions adopted for use of therapeutic bronchoscopy are inconsistent with sound medical practice. These indications were adopted by the hospital for the protection of its patients and itself. Dr. Friedman objects to the hospital's adherence to the adopted indications for therapeutic bronchoscopies, and nothing that Dr. Galati did independently.

In evaluating plaintiff's claim against other board members and the DCMH Board collectively, there is no evidence that the Board members made other than an independent judgment about Dr. Friedman. Nor is there any evidence that there was discussion about the impact of the decision on Dr. Galati or Dr. Powers or on hospital revenues or competition among physicians.[3] The uncontradicted record shows [4] that the DCMH Board's revocation of Dr. Friedman's privileges resulted from its belief that, as the ad hoc committee had found, the charges against plaintiff had been substantiated and that he had no intention of improving his behavior. The Board, therefore, reasonably believed and logically concluded that probation would be useless, and

that the risk of civil liability was strong should a claim of malpractice arise based on the fact that a physician was being permitted to violate hospital rules which had been adopted for patient care and safety.[5]

Further, the Board's decision was reasonable and was arrived at fairly. Because the Board's decision differed from the MEC's recommendation, the matter was referred to the Board's Joint Conference Committee. Dr. Friedman and his attorney were given the right to appear before this committee to attempt to persuade in favor of probation. Both declined to do so. They were invited to address the Board which reconsidered its earlier decision for revocation of privileges. Instead of suggesting a willingness to comply with the therapeutic bronchoscopy indications, Dr. Friedman, through counsel, threatened to sue each board member personally for damages should the privileges be finally terminated. The Board members obviously were not intimidated by the prospect of having to justify their decision.

An inference of conspiracy cannot rationally be drawn where the Board reasonably acted within its authority on unappealed substantiated findings of misconduct and where there was every indication of intention on the part of the malcontent physician to continue as before. In short, where the decision is highly consistent with independent action, in the absence of some direct evidence of agreement, a Sherman Act conspiracy cannot be inferred out of whole cloth, even if the ultimate decision happens

---

3. Defendants have submitted deposition and affidavit evidence from Board members substantiated by Board minutes, attesting to the independence of judgment by the Board on the appropriate sanction for Dr. Friedman's misconduct.

4. Plaintiffs submit nothing to rebut this evidence or even to suggest unlawful conduct by the members of the Board.

5. The Board was confronted with: the decision of the ad hoc committee of medical reviewers that each of the seven charges against Dr. Friedman were substantiated, findings from which there was no appeal; a physician determined not to follow medically sound criteria adopted by DCMH for the health and safety of patients; a legal opinion that toleration of deviation from

such an adopted guideline of patient care was an invitation to medical malpractice claims; and the position of the Director of the Department of Medicine that he would be unwilling to participate in the monitoring process that would be required of him or members of his department as part of the probation recommendation due to legal exposure should medical malpractice occur. The Board's decision to accept the ad hoc committee's findings of misconduct was consistent with Dr. Friedman's lack of appeal of the decision. Its rejection of the probation recommendation and vote for revocation of privileges was consistent with the fact that Dr. Friedman had not agreed to be bound by the criteria adopted by the hospital.

to be consistent with the economic interests of a competitor of the plaintiff. The facts support a conclusion that the Board was motivated to terminate Dr. Friedman out of concern for the hospital rather than personal vindictiveness against Dr. Friedman. This court can conclude that based upon the factual evidence presented plaintiff's claim of conspiracy against the Board is implausible. *Matsushita*, 106 S.Ct. at 1350. Plaintiffs have failed to adduce any evidence that excludes the possibility that the hospital acted independently or for a legitimate purpose. *See White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 1987-1 Trade Cas. (CCH) ¶ 67,574 (4th Cir. 1987).

Friedman has not brought evidence before this court to support his claim of conspiracy. Plausible independent and valid reasons exist for the decision made by the DCMH. Moreover, Friedman has not proffered evidence sufficient to distinguish the decisionmaking of Dr. Galati from other members of the Board. For this court to infer that Dr. Galati acted in an anticompetitive manner in light of the evidence submitted would require this court to let stand an allegation of conspiracy based wholly on stacking inference upon inference, hearsay and ultimately improper speculation. *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105 (3d Cir. 1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). The Supreme Court spoke directly on the issue of the standard to determine sufficient evidence to sustain a conspiracy antitrust claim. In *Monsanto Co. v. Spray–Rite Service Corp.*,[6] 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) the Court stated that:

[t]he correct standard is that there must be evidence that tends to exclude the possibility of independent actions by the manufacturer and distributor. That is, there must be direct or circumstantial evidence that reasonably tends to prove ... a conscious commitment to a common scheme designed to achieve an unlawful objective.

104 S.Ct. at 1473.

"Inferred factual conclusions based on circumstantial evidence are permitted [to go to the jury] only when, and to the extent that, human experience indicates a probability that certain consequences can and do follow from the basic circumstantial facts." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d at 116. In the issue at hand human experience does not necessarily lead to the conclusion that defendants acted "to exclude plaintiff from practicing medicine at DCMH for the purpose of destroy[ing] and obtain[ing] for themselves a large portion of plaintiff's practice." (Amend. Comp., ¶ 23). Conceivably, defendants excluded plaintiff from practicing at DCMH because of his unorthodox use of therapeutic bronchoscopies which potentially increased hospital liability. Thus, plaintiff's asserted facts are speculative. Evidence, "some of [which] is speculation and some ... hearsay ... is hardly the kind of play upon which to rely for an antitrust case." *Mid–South Grizzlies v. National Football League*, 550 F.Supp. 558, 569 (E.D.Pa.1982) *aff'd* 720 F.2d 772 (3d Cir. 1983). In *Mid–South*, an antitrust case where the district court granted summary judgment, the court held that "plaintiff had not provided a sufficient quantum of evidence to permit a party to go to the jury." *Id.* Such is true here. Friedman has not provided sufficient evidence of conspiracy to be permitted to go to the jury. While it is true that on a summary judgment motion, this court must resolve all doubts as to the existence of genuine issue of fact against the movant and must view all inferences from the facts in the light most favorable to the opposing party.[7] The court must weigh the circumstantial evidence,

---

**6.** In Monsanto, the court considered the quantum of evidence necessary before a conspiracy could be inferred in a situation where a manufacturer had allegedly terminated one of its distributors pursuant to a virtual price fixing conspiracy with other distributors. The court emphasized that the manufacturer could refuse to

deal as long as the decision was its own and that this principle would be seriously eroded "[if] an inference of such an agreement may be drawn from highly ambiguous evidence." 104 S.Ct. at 1470.

**7.** Fed.R.Civ.P. 56(c).

and in doing so, consider that "[t]here are limits beyond which reasonable inference—drawing degenerates into groundless speculation." *Tunis Brothers Co. v. Ford Motor Co.*, 587 F.Supp. 267, 1984–2 Trade Cas. (CCH) ¶ 66,068 at 65,932 (E.D.Pa.1984). To allow plaintiffs claim to stand would be to allow the jury to rule upon groundless speculation. Plaintiff cannot effectively rely upon the fact that Dr. Galati practices in the same field as he and thus potentially can financially benefit from his dismissal as the basis for a conspiracy action. *See Stone v. William Beaumont Hospital*, 1983–2 Trade Cas. (CCH) ¶ 65,681 (N.D.Ill. 1983) [Available on WESTLAW, DCT database].[8] Indeed, as the court held in *Robinson v. Magovern*, 521 F.Supp. 842, (W.D. Pa.1981), *aff'd mem.*, 688 F.2d 824 (3d Cir. 1982), *cert. denied*, 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982), "If the first entity [the hospital] discontinues its business relationship with a firm [the plaintiff physician] for its own, independent reasons, no concerted activity has occurred even though the second entity [a competing physician] had requested that the first entity take such action." *Id.* at 893 n. 42.

## B. *Section 2 of the Sherman Act*

Plaintiff alleges that his exclusion from the staff at DCMH has resulted in the "monopolization, or attempted monopolization" of "pulmonary medical services" at DCMH. (Amended Complaint ¶ 47). Plaintiff alleges further that the Drexel Hill defendants conspired with the other defendants in "an attempt to monopolize the provision of pulmonary care in the market served by the defendant hospital." (Amended Complaint ¶ 46).

In sum, plaintiff claims a Section 2 Sherman Act violation on the theories of monopolization, attempted monopolization and a conspiracy to monopolize. Plaintiff has failed to prove his Section 2 Sherman Act claim under any of these theories; therefore, summary judgment must be granted on the Section 2 claims.

### 1. *Monopolization*

■ In order for plaintiff to establish that monopolization occurred he must show that defendants possessed monopoly power.[9] *U.S. v. Grinnell*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *Robinson v. Magovern*, 521 F.Supp. at 886. The Board at DCMH does not possess the power to exclude competition in the pulmonary medicine field. This is quite simply because physicians who object to DCMH's conservative bronchoscopy indications are free to have their patients admitted at hospitals subscribing to a more liberal practice. Within the immediate vicinity of DCMH are Bryn Mawr Hospital, Fitzgerald–Mercy Hospital, Riddle Memorial Hospital, Haverford Community Hospital, Lankenau Hospital, Taylor Hospital and Metropolitan–Springfield Hospital. Dr. Friedman himself has privileges at Fitzgerald–Mercy Hospital. (DCMH Ex. 1, Affidavit, Richard Thomas, president and CEO of DCMH).

The Board of DCMH cannot exclude Dr. Friedman and his liberal school of bronchoscopy from practicing at any of these hospitals in the relevant market. Defendants simply cannot exclude competition from within the ten mile radius of DCMH where all of the aforementioned hospitals are located. Therefore, as a matter of law plaintiff cannot establish that defendants have market power to exclude competition. *Pontius v. Children's Hospital*, 552 F.Supp. 1352, 1366 (E.D.Pa.1982).

■ Plaintiff contends that DCMH is the relevant geographical market for the Section 2 Sherman Act claim. Plaintiff has advanced nothing to support this claim. "The area of effective competition is the territory within which the buyer has, or is the absence of unlawful market power would have, the ability to seek alterna-

---

**8.** In Stone the court held that the opportunity to conspire, the power of one alleged co-conspirator to dominate the other, and close ties and conversations among them are not sufficient facts from which to infer a conspiracy.

**9.** Monopoly power is the ability to control prices or exclude competition from the relevant market. *Fleer Corp. v. Topps Chewing Gum*, 658 F.2d 139, 154 (3d Cir.1981).

tives." *Pontius v. Children's Hospital, Id. See also U.S. v. Philadelphia National Bank*, 374 U.S. 321, 359–61, 83 S.Ct. 1715, 1739–40, 10 L.Ed.2d 915 (1963). In cases involving doctors, the geographic market has been defined as the area in which doctors can sell and patients can buy medical service. *Robinson v. Magovern*, 521 F.Supp. 842. Thus, courts have taken an expansive view of the relevant geographical market for services provided. Dr. Friedman's contention that DCMH is the relevant geographical market is out of step with existing precedent and with practical commercial realities which govern defining a geographic market. *Brown Shoe Co., Inc. v. U.S.*, 370 U.S. 294, 336, 82 S.Ct. 1502, 1530, 8 L.Ed.2d 510 (1962). Plaintiff's contention that the relevant geographical market for purposes of monopolization is DCMH is so restrictive as to be unreasonable as a matter of law.

■ Under a monopolization theory, plaintiff must also prove the willful acquisition or maintenance of monopoly power. *U.S. v. Grinnell*, 384 U.S. at 570–571, 86 S.Ct. at 1703–04. Plaintiff has not shown a general intent of the defendants to monopolize the bronchoscopy practice area. There is no indication that DCMH has discouraged competition from area hospitals in the bronchoscopy practice area. Indeed, its termination of Dr. Friedman's privileges is evidence of a general intent not to monopolize since a monpolist hospital would not want an able practitioner looking for a new home in which to conduct his specialty. *See Robinson v. Magovern*, 521 F.Supp. at 891–892. Similarly, when considering the Section 2 claim against Drs. Galati and Powers, plaintiff cannot effectively establish that Drs. Galati and Powers engaged in any unlawful willful act towards monopolization. If they wanted to monopolize the bronchoscopy market Dr. Galati would have supported efforts to eliminate permanently his competition from practicing at DCMH. On the contrary, Dr. Galati was willing to go along with the MEC's recommendation of probation for Dr. Friedman.

Nor can it be said that Drs. Galati and Powers individually, or as members of the Medical Associates of Drexel Hill, engaged in any act to acquire or maintain a monopoly at DCMH. Plaintiff claims that the Medical Associates of Drexel Hill being the only pulmonary specialist physicians currently practicing at DCMH, possess a monopoly in pulmonary service. However, there is no evidence from which a jury could draw a reasonable inference that defendants had any intent to monopolize the pulmonary service field. The monopoly, if it existed, occurred through an historic accident which resulted from Dr. Friedman's unwillingness to follow DCMH rules and regulations. As such, the monopoly would not violate Section 2 of the Sherman Act. *U.S. v. Grinnell*, 384 U.S. at 570–71, 86 S.Ct. at 1703–04.

2. *Attempted Monopolization*

To establish attempted monopolization plaintiff must prove that defendants had a specific intent to monopolize the relevant market; engaged in conduct to implement the specific intent; and that there was a dangerous probability of success. *Swift, et al. v. United States*, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905).

■ Plaintiff cannot prove that the defendants had a specific intent to monopolize the bronchoscopy field. Defendants have shown that the decision to terminate Dr. Friedman was based upon a legitimate business reason—that of reducing hospital liability due to Dr. Friedman's method of practice. A valid business decision as was made here by DCMH acts to "bear out the specific intent essential to sustain an attempt to monopolize under § 2." *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 627, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953).[10]

Plaintiff cannot establish that there was a dangerous probability of achieving a monopoly in the market. There are numerous hospitals located within a ten mile radius that engaged in the pulmonary service/broncoscopy field in which Dr. Fried-

10. Since plaintiff cannot establish that defendant engaged in a specific intent to monopolize, plaintiff cannot show that defendants engaged in conduct to implement the specific intent.

man practices.[11] Thus, there does not exist a dangerous probability that DCMH will achieve a monopoly in the geographic market.

### 3. *Conspiracy to Monopolize*

The essential elements of a conspiracy to monopolize are (1) an agreement or understanding between two or more economic entities, (2) a specific intent to monopolize, and (3) the commission of an overt act in furtherance of the alleged conspiracy. *See e.g., Continental Ore Co. v. Union Carbide of Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1902). The plaintiff also has the burden of providing sufficient evidence to establish that the conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Edward J. Sweeney and Sons v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980).

 Plaintiff has presented no evidence defendants engaged in a conspiracy to monopolize. In light of the discussion on a Section 1 Sherman Act violation, first, plaintiff cannot establish that two or more economic entities were involved in this action. Agents of DCMH made the decision to terminate Dr. Friedman; no other entity was involved in that decision. Second, for the reasons stated under Attempt to Monopolize, *infra,* plaintiff cannot prove that defendant engaged in a specific intent to monopolize. Thirdly, plaintiff has not shown an overt act in furtherance of the conspiracy. Plaintiff's termination was a business judgment decision necessary to eliminate Dr. Friedman from the staff after he failed to comply with hospital regulations.

### C. *Due Process Claims*

 No inference of unlawful purpose, and certainly not an anti-competitive purpose, can be drawn from the charging and hearing procedures accorded plaintiff by DCMH. The hospital's bylaws were followed in every respect. Plaintiff's claim of lack of due process has been reviewed through two levels of the state court system. Each has found that plaintiff was given full due process. Plaintiff is now precluded by principles of res judicata from relitigating the due process hearing issues in this court at this time.

Importantly, Friedman was given a full hearing on the charges before the ad hoc committee. He presented a full defense, including the contention that his "liberal" bronchoscopy methodology was an accepted mode of treatment. However, even his witnesses did not agree with all of his bronchoscopies or the means or lack of means by which he documented the need for the bronchoscopy.[12] Dr. Friedman's failure to document the need for the invasive procedure was a critical portion of the charges by Dr. Hadfield and the adverse findings of the ad hoc committee.

Plaintiffs' contention that the Board did not have authority under the by-laws to alter the MEC recommendation is not correct. Article VIII, section 1(A) of the by-laws advises that any practitioner who is affected by an adverse recommendation of the Medical Executive Committee, after hearing before an ad hoc committee, shall be entitled to an appellate review by the "Governing Body," the Board, before that body makes a final decision. Article VIII, section 2(c) advises that if there is no timely request for appellate review of an adverse recommendation of the MEC to the Board, a waiver of such review is deemed made and the recommendation becomes and remains effective against the practitioner pending the Governing Body's decision on the matter. Within 30 days after

---

**11.** Supra p. 194.

**12.** Dr. William Atkinson, Director of Chest Disease at Presbyterian Hospital, stated to Dr. Friedman that it was necessary

 that you document the need for invasive procedures and that you document the results on the progress notes. Arterial blood gas analysis, recent x-ray and coagulation profile

are a must prior to undertaking bronchoscopy. In instances where the bronchoscopy is done for therapeutic reasons, an ABG and chest x-ray should be done after this procedure or the next morning to evaluate its effectiveness.

(DCMH Ex. No. 115, Ltr. from Dr. Atkinson to Dr. Friedman).

completion or waiver of appellate review, the Board is obligated to make its final decision in the matter. According to Article VIII, section 7(A), if the decision is in accordance with the MEC's last recommendation, the recommendation shall become final. If the decision is contrary to the recommendation, the Board is obligated to refer the matter to a Joint Conference Committee for further review and recommendation withholding final decision for 30 days awaiting that committee's recommendation. Thereafter, the board is called upon to make a final decision at its next meeting.

The structure of the by-laws contemplates that the Governing Body makes the final decision on recommendations from the MEC on matters involving appointment or status of staff privileges and does not rest that ultimate decision with the Medical Executive Committee.

With respect to the burden of proof at a hearing, plaintiff's contentions are likewise not well founded. The by-laws obligate the representative of the medical staff, if as here its actions prompted the hearing, to present facts in support of its adverse decision and to examine witnesses. Article VIII, section 5(H). Thereafter, the affected practitioner is obligated to support his challenge to the adverse recommendation by an appropriate showing that the charges lack factual basis or the underlying decision is arbitrary, unreasonable or capricious. *Id.* The practitioner does not have the laboring oar of going forward with evidence. That burden is upon the accusing committee.[13]

The disclosure to the Board that Dr. Hadfield and the other section chiefs had objections to the monitoring aspects of the Medical Executive Committee's recommendation was appropriate and important to a legitimate interest of the board. The objectors expressed significant malpractice concerns for the hospital in view of the sub-

stantiation of the charges and Dr. Friedman's avowed intentions not to be constrained by the hospital's criteria for therapeutic bronchoscopy. These concerns were reasonable and essential to the Board's determination of the efficacy of probation and guaging of the level of disharmony among staff that the probation might generate. This is particularly important since the ad hoc committee had already found that Dr. Friedman's misconduct had caused disharmony among the staff.

Likewise, there was no due process violation in the Board's review of Dr. Friedman's personnel file to attempt to ascertain the appropriateness of the recommended probation sanction as well as the malpractice risk which could be influenced by all that the board knew or should have known about Dr. Friedman's history at the hospital as reflected in that file. Not only was there a right to know but a need to know that record.

### D. *Plaintiff's Pendent State Claims Must Be Dismissed*

██ Having found no federal jurisdiction over plaintiffs' claims, the pendent state claims must be dismissed for lack of subject matter jurisdiction. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The state breach of contract claims are already under consideration by the Court of Common Pleas of Delaware County and plaintiff has moved for partial summary judgment on the issue of whether the act of reappointment by the board ratified or approved Dr. Friedman's past performance and precluded his past record from being considered in the charges against him. For federal claim analysis, suffice it to say, that plaintiff did not appeal the decision of the MEC as to the timeliness of the charges or the findings of substantiation.

---

**13.** However, even if that were not so, constitutional due process guarantees would be satisfied if the practitioner was advised of the charges and given a reasonable opportunity to rebut them and to cross-examine his accusers. Here, beyond question, the essential items of notice

and hearing were accorded Dr. Friedman. Moreover, an impartial hearing officer was appointed to conduct the proceeding and an impartial panel was appointed to decide whether the charges were substantiated.

## FINAL ORDER

AND NOW, this 19th day of October, 1987, it is hereby ORDERED that:

1. Summary judgment as to the federal claims is GRANTED for the defendants and against the plaintiff.

2. Plaintiff's cross motion for partial summary judgment is DENIED.

3. Plaintiff's pending state claims are DISMISSED without prejudice.